UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CRIM. NO. 21-164 (NEB/BRT)

UNITED STATES OF AMERICA,

Plaintiff,

v.

SAMSON DIAMONTE XAVIOR SMITH,

Defendant.

**MEMORANDUM IN
SUPPORT OF
MOTION TO SUPPRESS
EVIDENCE OBTAINED
IN VIOLATION OF THE
FOURTH AMENDMENT**

Defendant Samson Diamonte Xavior Smith has filed a motion asking the

Court to suppress evidence obtained in reliance on three searches. (*See* ECF 21.)

First, Mr. Smith asks the Court to suppress evidence obtained in reliance on a

search warrant at an apartment on Magnolia Avenue in St. Paul. Second, Mr.

Smith asks the Court to suppress the buccal swab and subsequent DNA testing

and comparison that was poisonous fruit of the illegal search of the apartment.

Finally, if the Court does not suppress the DNA comparison as poisonous fruit,

Mr. Smith argues in the alternative that it should be suppressed as an unlawful

warrantless search.

Mr. Smith, in support of his suppression motion, now offers the following:

## ARGUMENT

**I.     THE AFFIDAVIT FAILS TO ESTABLISH PROPER NEXUS TO THE MAGNOLIA AVENUE APARTMENT, AND GIVEN THE EGREGIOUS DEFICIENCIES OF THE AFFIDAVIT, THE SEARCH CANNOT BE SAVED BY GOOD FAITH.**

The express purpose of the Fourth Amendment is to secure the "houses, papers, and effects of this nation's citizens from governmental intrusion." U.S. Const. amend. IV. Its protective force is strongest at the private home's doorstep. *Kyllo v. United States,* 533 U.S. 27, 31 (2001). Any police officer seeking to invade a private home must first obtain a valid search warrant upon showing probable cause to the satisfaction of a neutral magistrate. *See Groh v. Ramirez,* 540 U.S. 551, 559-60 (2004). "When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee,* 757 F.3d 810, 819 (8th Cir. 2014) (citation and internal punctuation omitted).

Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place given the circumstances set forth in the affidavit." *United States v. Tellez*, 217 F.3d 547, 549 (8th Cir. 2000). But suspicion that a person has engaged in criminal activity does not automatically give rise to suspicion regarding that person's residence: "The critical element in a reasonable

2

search is not that the owner of the property is suspected of crime but that there is

reasonable cause to believe that the specific 'things' to be searched for and seized

are located on the property to which entry is sought." *Zurcher v. Stanford Daily*,

436 U.S. 547, 556 (1978).

According to the affidavit here, the contraband the officers sought inside the

Magnolia Avenue apartment was a black and grey Glock that Mr. Samson

allegedly possessed. But the affidavit failed to establish any reasonable basis to

believe this allegation, because it failed to establish any source for the alleged

information regarding a firearm or any reason why it should be deemed credible.

The affidavit alleged that officers had been attempting to locate Mr. Smith to

execute an "Offender Release Violation/Body Only/Felony" warrant during

December 2019. Using various investigative techniques, they came to believe that

Mr. Smith was living in apartment #2 in a building on Magnolia Avenue in St.

Paul. Then, on January 1, 2020, officers were dispatched to the apartment

building "in response to a weapons complaint." As recounted by the affiant

officer:

> Information provided to dispatch revealed that a male subject
> identified as SMITH was seen in possession of a black firearm,
> possibly a Glock. The firearm was described as having a black
> bottom and a gray top. Further information indicated that SMITH
> was seen running back inside 1519 Magnolia Ave with the firearm.
> SMITH was described as wearing a black sweater with gray

sweatpants and standing approximately 5'8 inches tall with a thin
build.

(*Id*. at 3.) This was the only information the affidavit gave related to the firearm
or the source of that information.

    This bare-bones affidavit fails to establish probable cause to believe that a
firearm would be found in the specified apartment. The affidavit gives no
information identifying the source of the "information provided to dispatch,"
nor any information that could reasonably imply that the officers knew the
identity of the source of information. The affidavit provides no information
regarding when the anonymously-sourced information was provided or when
Mr. Smith was allegedly in possession of a firearm. The affidavit says that the
"male subject" was "identified as SMITH," but it doesn't say who identified the
subject as Mr. Smith, when he was identified, or whether it was even the same
source of information who alleged that Mr. Smith had a firearm.

    What makes this affidavit especially egregious is how the information
provided in this affidavit fails even to meet the standard for establishing
reasonable suspicion, let alone probable cause. *See Florida v. J. L.*, 529 U.S. 266
(2000). In *J.L.*, an anonymous caller told police "that a young black male standing
at a particular bus stop and wearing a plaid shirt was carrying a gun[.]" *Id*. at
268. Based solely on that tip, officers found a Black teenager in a plaid shirt at the

specified bus stop, frisked him, and found a gun. *See id*. Florida attempted to

argue that the officers suitably corroborated the tip, because they found the

person the caller identified where he was predicted to be. The Supreme Court

rejected this argument, emphasizing that "[t]he reasonable suspicion here at

issue requires that a tip be reliable in its assertion of illegality, not just in its

tendency to identify a determinate person." *Id*. at 272.

Here, the information merely said that Mr. Smith was in an apartment

building (the tip did not identify an apartment number) where police already

believed he was living. The tip had no other predictive power. Officers went to

the building and found Mr. Smith. They did not see a gun on Mr. Smith's person,

nor did they see one when they entered and swept the apartment. (*See* Govt Ex. 1

at 3 (noting that after Mr. Smith was arrested, "[a] security sweep of the

apartment was conducted").)

Evidence obtained in violation of a citizen's Fourth Amendment rights is

generally subject to suppression as a deterrent to future illegal governmental

conduct. *See, e.g.*, *United States v. Calandra*, 414 U.S. 338, 348 (1974). But

suppression is not required when an officer violates a defendant's Fourth

Amendment rights in objectively reasonable reliance on a warrant reviewed and

approved by a neutral magistrate. *See United States v. Leon*, 468 U.S. 897, 922

(1984). *Leon* identified four situations where suppression would still be necessary because an officer's reliance on a warrant would not qualify as objectively reasonable:

> (1) when the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that the executing officer could not reasonably presume the warrant to be valid.

*United States v. Grant*, 490 F.3d 627, 632–33 (8th Cir. 2007) (quoting *Leon*, 468 U.S at 923).

The warrant here is not entitled to the general presumption of good faith because the lack of any information regarding the source of information was so apparent that it would have been obvious to any reasonable officer. Where "affidavits simply do not say very much about [the defendant] or his residence," officers cannot reasonably rely on the issuing judge's probable cause determination. *United States v. Herron,* 215 F.3d 812, 814 (8th Cir. 2000). In *Herron,* a search warrant was issued for Mr. Herron's residence, following his alleged involvement in a relative's marijuana growing operation. While the supporting affidavits included his prior marijuana convictions and his family relationship to

the marijuana growers, "the affidavits [made] only two passing references to the

Herron residence" and only three references to Mr. Herron. *Id.* at 815. In

determining that suppression was warranted despite the good faith exception,

the Eighth Circuit ruled that "the lack of probable cause in the affidavits would

have been apparent to reasonable officers." *Id.* The failure to establish even

reasonable suspicion under *J.L.* made the lack of probable cause in this case so

obvious that any reasonable officer could plainly see it on the face of the warrant.

On similar facts to those found here, Judge Frank found that the good-faith

exception could not save a search warrant affidavit that failed to include any

"critical information" regarding "the age of the information, the source of the

information, and the credibility and veracity of that information." *See* Order and

Memorandum at 4, *United States v. Nelson*, Crim. No. 04-465(1) (DWF/JSM).

Without this, "there was no manner in which the issuing judge could test the

veracity and basis of knowledge of" the investigation. *See id*. at 5. And because

the affidavit was "so lacking on the issue of probable cause as to render official

belief in its existence entirely unreasonable on the record," Judge Frank ordered

the evidence obtained in reliance on that warrant suppressed. *Id*. at 7–8. "To

conclude otherwise would sanction the preparation and use of such deficient

affidavits." *Id*. at 8.

The warrant affidavit here clearly failed to establish any source of information who could provide nexus to the apartment to justify a search. The information presented was not even enough to support reasonable suspicion. Under these circumstances, the good-faith exception cannot save the unlawful search. Mr. Smith respectfully asks the Court to suppress all evidence recovered, directly and indirectly, from the illegal search of the apartment.

II.      **THE POISONOUS FRUIT OF THE ILLEGAL SEARCH MUST BE SUPPRESSED.**

Without the evidence uncovered during the illegal search of the apartment, there would have been no warrant to obtain a DNA swab from Mr. Smith. Because that DNA swab and the subsequent DNA profiling and comparison were fruit of the original illegality, they are also subject to suppression.

The exclusionary rule demands suppression of not just the evidence obtained directly from an illegal search, but also ""evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citation omitted). Suppression "'extends as well to the indirect as the direct products' of unconstitutional conduct." *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). All tangible or testimonial evidence obtained as a result of an illegal search must be suppressed, "up to the point at which the connection with the unlawful search becomes 'so attenuated

as to dissipate the taint[.]'" *Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nardone* v. *United States*, 308 U.S. 338, 341 (1939)).

Here, Tina Kill of the St. Paul Police Department obtained a warrant for a buccal swab. (*See* Govt Ex. 2; Mtns Hrg T. 21–22.) The only purpose of that warrant was to take Mr. Smith's DNA so that it could be tested and compared to the contraband found in the Magnolia Avenue apartment. As Sgt. Moore testified, without the items found during the search of the apartment, there would have been no need to obtain Mr. Smith's DNA because there would have been nothing to compare it to. (*See* Mtns Hrg T. 21–22.)

This case involves neither inevitable discovery nor an independent source. For the independent-source doctrine to apply, the government would have to show "both (1) that the decision to seek the warrant was independent of the unlawful entry—i.e., that police would have sought the warrant even if the initial entry had not occurred—and (2) that the information obtained through the unlawful entry did not affect the magistrate's decision to issue the warrant." *United States v. Khabeer*, 410 F.3d 477, 483 (8th Cir. 2005) (citing *Murray*, 487 U.S. at 542). Because both common sense and Sgt. Moore's testimony tell us that the police would not have sought the warrant for Mr. Smith's DNA without the

contraband obtained during the illegal search of the apartment, this doctrine does not apply.

Likewise, inevitable discovery would require the government to make two showings, one of which being "that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Madrid*, 152 F.3d 1034, 1038 (8th Cir. 1998) (citations omitted). Here, there was no other active line of investigation that would have led inevitably to the taking of Mr. Smith's DNA, so this doctrine does not apply.

The illegal search of the Magnolia Avenue apartment led directly to the DNA swab and its comparison to the DNA recovered from the firearm Mr. Smith allegedly possessed in June 2021. Because this is all fruit of the poisonous tree, Mr. Smith respectfully asks the Court to order it suppressed in its entirety.

III.     IN THE ALTERNATIVE, THE DNA COMPARISON DOCUMENTED IN GOVERNMENT'S EXHIBIT 6 WAS AN UNLAWFUL WARRANTLESS SEARCH.

If the Court should rule that the DNA comparison conducted on the firearm recovered in June is not subject to suppression as fruit of the illegal search in January, Mr. Smith asks the Court in the alternative to order the suppression of the comparison as an unlawful warrantless search.

The government has presented evidence showing that, when Mr. Smith's DNA was taken in reliance on the search warrant prepared by Off. Kill, the BCA

used that sample to prepare a profile. (*See* Govt Ex. 2; Mtns Hrg T. 27–28.) That warrant explained that probable cause existed to obtain a sample of Mr. Smith's DNA in order to compare it against samples taken from contraband found in the Magnolia Avenue apartment.

When it comes to blood tests, the Eighth Circuit has interpreted Supreme Court precedent to mean that "the taking and later analysis of the blood are a single event for Fourth Amendment purposes . . . and that a search is completed upon the drawing of the blood." *Dodd v. Jones*, 623 F.3d 563 (8th Cir. 2010) (cleaned up) (quoting decisions from the Ninth and D.C. Circuits interpreting *Schmerber v. California*, 384 U.S. 757 (1966)). But blood testing as understood by *Schmerber* in 1966 is not the same as a DNA test and comparison in 2021, and many of the concerns outlined in *Schmerber* itself show why a neutral magistrate should stand between law enforcement and the search that occurred here.

*Schmerber* involved alcohol testing of blood following a suspected DWI. The Court ruled that the blood-draw was a Fourth Amendment search, but that the search was justified on the facts of that case because of exigent circumstances. *See* 384 U.S. at 770–71 ("Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned.").

But *Schmerber* emphasized the limits of its holding. The decision concluded with a warning: "That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body **under stringently limited conditions** in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Id*. at 772.

Testing blood for alcohol is in no way comparable to a DNA analysis. The degree of information potentially exposed, and the sensitivity of that information, requires greater caution. In much the same way that the standard search-incident-to-arrest doctrine had to bend to acknowledge the implications of new technology, *see Riley v. California*, 573 U.S. 373 (2014) (requiring a warrant to search cell phones recovered incident to arrest), the interpretation of *Schmerber* found in *Dodd* should not be read in such a way as to ignore the implications of DNA profiling.

Our DNA holds "vast quantities of personal information." *Riley*, 573 U.S. at 386. They can reveal the presence of or propensity toward certain diseases or details of the person's ancestry stretching back millenia. *See*, *e.g.*, Devika Bansal, *What Can You Find Out from Your Own Genome?* Mar. 9, 2017, *available at* https://scopeblog.stanford.edu/2017/03/09/what-can-you-learn-from-your-own-genome-science-writer-carl-zimmer-found-out/ (last visited Oct. 22, 2021)

12

(documenting how, for $1000, a science writer obtained a copy of his full genome, showing among other things that 2% of his genes came from Neanderthals).

Mr. Smith concedes, as he must, that no precedent stands clearly for the proposition that the government was required to obtain a warrant before comparing Mr. Smith's profile against recovered samples. But, because of the sensitivity of the information potentially exposed, Mr. Smith maintains a warrant was nonetheless required to engage in further comparisons using the profile created from Mr. Smith's DNA, and so the failure to obtain a warrant here makes the results of the comparison subject to suppression.

## CONCLUSION

The affidavit for the search warrant on the Magnolia Avenue apartment failed utterly to identify the source, age, or credibility of information regarding the alleged firearm, when that firearm was the only basis for searching the apartment. Any reasonable officer would have understood the facial deficiency of the affidavit, and so the officer is not entitled to the standard presumption of good faith. Mr. Smith respectfully asks the Court to order the suppression of all evidence obtained directly or indirectly as a result of that illegal search, including the items found in the apartment, as well as the buccal swab and subsequent profiling and comparisons.

In the alternative, Mr. Smith respectfully asks the Court to order the suppression of the BCA's DNA comparison to the firearm recovered in June because it was a warrantless search not excused by any warrant exception.

Respectfully submitted,

Dated: October 22, 2021         /s/ Steven J. Wright
                                    Minnesota Attorney #387336
                                    331 Second Avenue South, Suite 705
                                    Minneapolis, MN  55401
                                    Phone: 612-669-8280

                                    Attorney for Mr. Smith