UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21-CR-164 (NEB/BRT) |
| Plaintiff, | |
| v. | ORDER ON REPORT AND RECOMMENDATION |
| SAMSON DIAMONTE XAVIOR-SMITH, | |
| Defendant. | |

This case comes before the Court to address objections to a Report and Recommendation's resolution of Fourth Amendment issues. St. Paul police officers obtained and executed two search warrants—one to search an apartment where the defendant Samson Xavior-Smith was found by police and the second to obtain a buccal swab from Smith. Smith moved to suppress the evidence from those searches. Smith also argues that a later unrelated DNA comparison was a third unlawful search. In a Report and Recommendation, United States Magistrate Judge Becky R. Thorson recommended that this Court deny all three motions to suppress. (ECF No. 42 ("R&R").) Smith objects to the R&R. (ECF No. 43 ("Def's Obj.").) For the reasons that follow, the Court overrules Smith's objection and accepts the R&R.

## BACKGROUND

The R&R details the facts and procedural history of this case, (R&R at 2–6), which are undisputed. The Court lays out the facts necessary to rule on the objections.[1]

### I. The Residential Warrant

In January 2021, a police officer obtained a residential warrant to search an apartment on Magnolia Avenue in St. Paul. (R&R at 2.) As grounds, the officer affiant related that as of November 2020, police had a warrant for Smith's arrest and were therefore looking for him. (*Id.*) In December, an ATF Task Force officer put a GPS tracker on a telephone that police believed belonged to Smith, and agents determined that the device was inside a Magnolia Avenue apartment building. (*Id.* at 2–3.) Later, officers determined that a female associate of Smith's lived in apartment #2 of the Magnolia Avenue apartment building. (*Id.* at 3.)

On January 1, 2021, in possession of this information about the Magnolia Avenue apartment, officers were dispatched to the address in response to a weapons complaint. (*Id.*) "Information provided to dispatch" revealed that a man identified as Smith was seen with a black and gray firearm, possibly a Glock. (*Id.*) The person giving information to dispatch also said that Smith "was seen running back inside [XXXX] Magnolia Ave with the firearm" and that he was "wearing a black sweater with gray sweatpants and standing approximately 5'8 inches tall with a thin build." (*Id.*) When officers arrived on scene, they approached the window to apartment #2 and observed someone who matched Smith's description inside.

---

[1] In so doing, the Court cites the R&R and incorporates the citations it contains.

(*Id.*) When officers made contact at the apartment door, no one answered. (*Id.*) Officers then spoke with Smith's female associate by phone, and she left the apartment with a child. (*Id.*) Smith later left the apartment and was apprehended. (*Id.*)

Based on this information, officers obtained a search warrant for the apartment. They recovered a black and gray firearm, ammunition, and suspected narcotics. (*Id.* at 4.)

### II.     The DNA Swab Warrant

The day after Smith's apprehension, a St. Paul police officer obtained a DNA swab warrant for him. (R&R at 4.) To support probable cause for the issuance of the warrant, the officer affiant used some of the information contained in the residential warrant but also added some detail about the call received by dispatch on January 1. (*Id.* at 4–5.) In this affidavit, the officer stated that the caller reported "that she got into an altercation with another female at the address, and the female's boyfriend Samson SMITH pointed a handgun at . . . her causing her to fear for her safety. She described the firearm as a grey and black semi-automatic handgun." (*Id.* at 4.)

After receiving the warrant, officers obtained Smith's DNA and compared it to the DNA samples collected from the firearm and narcotics seized at the Magnolia Avenue apartment. (*Id.* at 5.) The Bureau of Criminal Apprehension ("BCA") also created a DNA profile report from Smith's DNA swab (*Id.*)

### III.     DNA Comparison

After this incident and before Smith was charged, in June 2021, Smith was involved in another incident with St. Paul police officers. (R&R at 5.) Someone reported to the police that they saw a man (later identified as Smith) pointing a gun at a driver. (*Id.*) When police arrived, they encountered Smith who ran from the officers and threw an object (later discovered to be a gun) into a garbage can within the officers' view. (*Id.*) The police officers captured Smith following a short foot chase and recovered the gun from the garbage can. (*Id.*)

The police officers submitted DNA samples from the gun to the BCA who completed a DNA profile comparison between the gun and Smith's DNA profile. (*Id.* at 6.) The results showed a match. (*Id.*) As is police custom, the officers did not obtain another warrant before testing the gun's DNA sample to Smith's DNA profile. (*Id.*)

This federal indictment stems from the June encounter and charges Smith with being a felon in possession of a firearm. (ECF No. 1.)

## ANALYSIS

### I.     Standard of Review

The Court reviews the portions of the R&R to which Smith objects *de novo*. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(3); D. Minn. LR 72.2(b)(3).

### II.     Motion 1: The Residential Warrant

#### A.     *Probable Cause*

Smith argues that the residential warrant lacked probable cause[2] that a firearm would be found in the Magnolia Avenue apartment, and he moves to suppress the evidence from the apartment. (ECF No. 21 at 1.) Probable cause exists when there are "sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008) (citation omitted). By using a "common sense approach," "considering the totality of the circumstances," and, with no evidentiary hearing, looking only to "the four corners of the affidavit," the Court can determine if a warrant is based in probable cause. *Id.* (citation omitted). In its probable cause determination, the Court must afford an issuing judge "substantial deference." *United States v. Evans*, 4 F.4th 633, 636 (8th Cir. 2021). And ultimately, when reviewing the issuance of a search warrant, the Court must determine whether the judge had a "'substantial basis'" for finding probable cause. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

The residential warrant is supported by probable cause. First, the warrant links Smith to criminal activity—it includes information about Smith's prior felony convictions and the

---

[2] The Fourth Amendment requires probable cause be shown before a judge authorizes a search warrant. U.S. Const. amend. IV; *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007).

5

prohibition against Smith possessing a gun.[3] (R&R at 2–3.) Second, the warrant provides sufficient information that the suspected gun would be in the Magnolia Avenue apartment. *Hudspeth*, 525 F.3d at 674 (probable cause requires a fair probability that "evidence of a crime will be found in a particular place"). The officers placed Smith's phone and his known associate in the apartment, the caller to dispatch saw him running into the apartment, and the police themselves saw him in the apartment right before his arrest and the warrant application.[4] (R&R at 2–4.) Smith's main contention is that the caller was not reliable. (Def's Obj. at 2–9.) The Court disagrees.

Smith argues that the residential affidavit does not describe the caller to dispatch by name or include all of the information the caller gave to dispatch. (ECF No. 38 ("Def's Mem.") at 3–5.) But a probable cause determination does not require all of this information when the warrant affidavit "properly viewed as a whole" demonstrates probable cause.

---

[3] The officers had further reason to believe Smith was engaged in criminal activity from the suspicious activity when they arrived (the Magnolia Avenue apartment lights were extinguished when officers attempted to make contact after seeing in the apartment a person matching Smith's description). (R&R at 3.) Considering the information the officers already had, this suspicious activity bolstered the conclusion that there was a "fair probability" evidence of a crime would be in the apartment. *Evans*, 4 F.4th at 636; (R&R at 2–4.)

[4] Smith takes issue with reference to the complainant as a "caller," arguing that the only way to determine she was a "caller" was by looking at the DNA swab warrant. (Def's Obj. at 3–4.) True enough that the DNA swab warrant added information about the caller, including her gender and that she was a caller, rather than some other sort of complainant. But the Magistrate Judge and this Court can use common sense to infer that the complainant called 911 after seeing Smith with a gun. *See Hudspeth*, 525 F.3d at 674 (adopting a "common sense approach" to examining an affidavit for a search warrant).

*Tech. Ordnance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2001) ("A law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not.")

Even without identifying the caller or including all of the information the caller relayed to dispatch, the warrant application sufficiently demonstrates the caller's reliability to support probable cause.[5] Assuming the complainant was a 911 caller, which common sense suggests, the caller's anonymity would not thwart the information's reliability. *Navarette*, 572 U.S. at 400 ("A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity."). And even without 911's safeguards, the caller's information was reliable: she gave Smith's name, a detailed description of Smith's gun, and predictive information about Smith's presence in the Magnolia Avenue apartment.[6] (R&R at 3 ("The firearm was described as

---

[5] Smith contends that the residential affidavit was further deficient because it did not describe *when* the caller saw Smith with a gun. (Def's Obj. at 4.) But the timeline of events suggests the caller saw Smith soon before officers arrived. The caller reported seeing Smith with a gun and then "running back inside" the Magnolia Avenue apartment. (R&R at 3.) Police were then dispatched, and when they arrived on scene, Smith was still inside the apartment building. (*Id*.) This timeline suggests reliability. *Navarette v. California*, 572 U.S. 393, 399 (2014) ("That sort of contemporaneous report has long been treated as especially reliable.").

[6] Smith does not find it predictive that he would be in the Magnolia Avenue apartment because "it was a condition presumably existing at the time of the call." (Def's Obj. at 7 (citing *Alabama v. White*, 496 U.S. 325, 325 (1990).) He also argues the caller knowing his name does not suggest reliability but instead that the caller knew him. (*Id.* at 8.) As Smith notes, the caller providing information about Smith's appearance and location may only be reliable in a limited sense. *Florida v. J.L.*, 529 U.S. 266, 272 (2000). But that was not the only

having a black bottom and a gray top.")); *United States v. Harry*, 930 F.3d 1000, 1006 (8th Cir. 2019) ("The information was specific rather than generic and therefore unlikely available to someone without reliable insight . . . .").

And importantly, even if purely anonymous, the caller's information was corroborated by the officers. "[A] tip received from an anonymous informant requires 'something more,' usually in terms of independent police corroboration, before probable cause may arise." *United States v. Nolen*, 536 F.3d 834, 840 (8th Cir. 2008). Following Smith's body warrant, a police investigation determined Smith was spending time in the Magnolia Avenue apartment. (R&R at 3.) After police were dispatched to the Magnolia Avenue apartment, officers approached the apartment building and saw a man matching Smith's description inside the apartment. (*Id.*) The apartment lights were "quickly extinguished" and "nobody answered the door." (*Id.*) After this standoff, the police officers saw and spoke with Smith *inside the apartment*. (*Id.*) It was only after this point that the officers applied for the residential warrant, and they included these facts in the affidavit. (*Id.* at 2–4.) "Even the corroboration of minor, innocent details" can support a probable cause finding. *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (quotation marks and citation omitted). And here,

---

information in the affidavit. The caller's accurate information combined with her gun description, the outstanding body warrant, the information the police already had about the Magnolia Avenue apartment, and the interaction the police had with Smith following the weapons complaint was more than enough for the issuing magistrate judge to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [them] . . . there is a fair probability that contraband or evidence of a crime [would] be found in a particular place." *Gates*, 462 U.S. at 238.

the officers corroborated the bulk of the caller's statements before applying for the residential warrant. So Smith's argument that the residential warrant's tip was unreliable fails.[7]

### B.    *Good Faith*

Even if the residential warrant lacked probable cause, the Court still would not suppress the evidence recovered because the residential warrant was facially valid, and the officers executing it did so in good faith. *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *Id.* (citing *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)). Under the *Leon* analysis, the Court asks if the warrant was "so lacking" in probable cause or was "so facially deficient" so that an officer relying on the warrant would be unreasonable. *Proell*, 485 F.3d at 431 (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)); *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006). Smith asserts that no officer could

---

[7] Smith contends that the residential warrant's reliability is similar to the tip in *Florida v. J.L.*, 529 U.S. 266 (2000) because the tip here was "anonymous." (Def's Obj. at 5.) The Court disagrees. In *Florida*, police received an anonymous tip that a young black male standing at a particular bus stop, wearing a plaid shirt was carrying a gun. 529 U.S. at 268. The Supreme Court held that this anonymous tip was insufficient to even create reasonable suspicion because the tip lacked "indicia of reliability"; it contained no predictive information (so the police officers could not corroborate the information) nor "supplied any basis for believing" the information. *Id.* at 271, 274. This is not the case here.

execute the residential warrant in good faith because the caller's "tip" did not even establish reasonable suspicion. (Def's Obj. at 10.) The Court has ruled otherwise above.

Smith further contends the tip is similar to that in *United State v. Herron*, 215 F.3d 812, 814 (8th Cir. 2000). (Def's Mem. at 6–7.) In *Herron*, the affidavits to support the warrant provided "no evidence that there was any illegal activity" at the location and no information that Herron "ever participated" in the alleged criminal activity. 215 F.3d at 814. The affidavits connected the criminal activity to the searched location with four-month-old evidence and only connected Herron with his past convictions and familial relationships. *Id.* The Eighth Circuit held that this information was insufficient for a "reasonable officer" to believe "these facts established probable cause to search" the location. *Id.* Here, the residential affidavit connected the location to the criminal activity—Smith was seen with a gun going into the Magnolia Avenue apartment. (R&R at 3.) And the affidavit connected Smith with criminal activity—the caller said he had a gun, and it was illegal for Smith to possess a gun. (*Id.* at 2–4.) The Court disagrees that the residential affidavit's information "was not even enough to support reasonable suspicion." (Def's Mem.at 8.) So Smith's argument on good faith also fails.

### III. Motion 2: The DNA Swab Warrant[8]

Smith's second motion seeks suppression of the evidence recovered from the DNA swab as fruit of the poisonous tree.[9] (ECF No. 21 at 1; Def's Obj. at 10.) Under the exclusionary rule, evidence derivative of an illegal search must be suppressed unless the inevitable discovery or independent source doctrine applies. *United States v. Madrid*, 152 F.3d 1034, 1037–38 (8th Cir. 1998) (discussing inevitable discovery doctrine); *Murray v. United States*, 487 U.S. 533, 537–38 (1988) (discussing independent source doctrine). Smith correctly notes that neither the inevitable discovery nor the independent source doctrine applies here. (Def's Mem. at 9–10.) Both doctrines are irrelevant given the Court's conclusion the residential warrant was valid. The DNA evidence will not be suppressed.

### IV. Motion 3: The DNA Comparison

Smith seeks suppression of the DNA comparison between Smith's DNA profile and the gun retrieved in the June 2021 incident, arguing that the comparison was done without

---

[8] The Court notes that a paragraph in the government's opposition papers related to this argument appears to have been unintentionally copied from a brief in another case. (ECF No. 41 ("Gov't's Mem.") at 13.) The Court did not consider the erroneously included argument for this Order.

[9] The affidavit for the DNA swab warrant provides that during the execution of the residential warrant, officers recovered a black and gray gun. (R&R at 4.) The officers asked in the DNA swab warrant for a buccal swab from Smith to compare his DNA to the DNA on the gun. (*Id.* at 4–5.) Smith argues that because the DNA swab warrant would never have been issued without the gun found in the Magnolia Avenue apartment, the warrant is likewise invalid. (Def's Mem. at 8–10.)

a separate warrant. (Def's Mem. at 10–13.) Smith contends that because DNA contains personal, sensitive information, the government needed a warrant to compare the DNA profile with the June 2021 gun. (*Id.* at 11–13.) But Smith agrees there is no case law directly supporting this proposition. (*Id.* at 13.) In fact, the law supports the opposite conclusion. In *Dodd v. Jones*, the Eighth Circuit determined that an officer was not liable under 42 U.S.C. Section 1983 for conducting an unlawful search of Dodd's blood after taking the blood and then failing to test the sample for a month. 623 F.3d 563, 568 (8th Cir. 2010). The court noted that a "search is completed upon the drawing of the blood." *Id.* at 569 (quotation marks and citation omitted). "[O]nce [the officer] had sufficient grounds to draw blood from Dodd . . . the subsequent testing of that blood had no independent significance for fourth amendment purposes."[10] *Id.* (quotation marks and citation omitted). The Court concludes the same here. Because Smith's "original expectation of privacy" in his DNA was already frustrated by the valid DNA swab warrant, the Fourth Amendment did not prohibit the officers from comparing the DNA profile to the June 2021 gun.[11] *United States v. Jacobsen*, 466 U.S. 109, 117

---

[10] Smith contends blood and DNA samples are "in no way comparable" because DNA holds more information than blood. (Def's Mem. at 12.) Here, though, the officers are not using Smith's DNA to "reveal the presence of or propensity toward certain diseases or details of the person's ancestry stretching back millenia." (*Id.*) The officers did not use the DNA profile for these purposes but for identification, which does not present "additional privacy concerns." *Maryland v. King*, 569 U.S. 435, 465 (2013).

[11] The government also contends the inevitable discovery doctrine applies here. (Gov't's Mem. at 18.) The Court agrees. Under the inevitable discovery doctrine, evidence is admissible even if the warrant was insufficient if "(1) there is a reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct,

(1984) (finding no privacy interest when a private party made something freely available to the government for inspection); *see also King*, 569 U.S. at 459, 464 (noting the common practice of law enforcement using legally obtained DNA to compare with future samples and that the additional intrusion of using DNA samples for identification instead of finger prints is "not significant").

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's objection (ECF No. 43) is OVERRULED;

2. The Report and Recommendation (ECF No. 42) is ACCEPTED; and

3. Defendant's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment (ECF No. 21) is DENIED.

Dated: February 3, 2022       BY THE COURT:

s/Nancy E. Brasel
Nancy E. Brasel
United States District Judge

---

and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Thomas*, 524 F.3d 855, 858 (8th Cir. 2008). The facts here meet these two prongs. Officers compared Smith's DNA profile to a gun they observed Smith throw into a trash can. (R&R at 5.) This information would have supported a warrant's probable cause determination. *See United States v. Welch*, No. 17-CR-253 (ADM/HB), 2018 WL 740388, at *5 (D. Minn. Feb. 7, 2018) (finding that a DNA sample would have been inevitably discovered had defendant not given consent because defendant would have given a DNA sample pursuant to a lawful arrest).